CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
for Charlottesville
OCT 19 2005
JOHN F. CORCORAN, CLERK
BY: Fay Coleman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        *Plaintiff,*<br><br>v.<br><br>PETER F. BLACKMAN,<br><br>                        *Defendant.* | CIVIL ACTION NO. 3:04CV00046<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

On April 1, 2005, this Court ordered the Defendant, Peter F. Blackman, to show cause as to why he should not be found in criminal contempt of court for an alleged violation of the Court's September 27, 2004 preliminary injunction. Accordingly, the Court must now decide whether the Defendant violated this order and is guilty of criminal contempt. For the reasons herein stated, the Court finds the Defendant to be in criminal contempt of court.

**I. Background**

This litigation arises from a controversy surrounding the Government's enforcement of an easement concerning the Eastern View Farm, a property in Louisa County, Virginia owned by the Defendant ("the Easement"). The Easement provides that the manor house on Eastern View Farm:

> will be *maintained and preserved in its present state* as nearly as practicable, though

1

*structural changes, alterations, additions or improvements* as would not in the opinion of the Grantee fundamentally alter its historic character or its setting may be made thereto by the owner, *provided that the prior written approval of the Grantee to such change, alteration, addition or improvements shall have been obtained.* This proviso applies as well to those 18th and 19th Century outbuildings located on the described property.

(Easement at 2.) (Emphasis added.) Upon purchasing the property at Eastern View Farm, the Defendant sought to make various alterations to the manor house. Specifically, these alterations included tearing off the existing front porch on the manor house, replacing the siding, and creating an addition. In support of these intended alterations, the Defendant submitted several sets of renovation plans to the National Park Service ("the NPS") for review, but the NPS repeatedly denied certain aspects of his plans. Rather than working with the NPS for final approval of his plan, the Defendant rejected any further Government involvement and subsequently removed the porch from the manor house.

The parties went on to conduct spirited litigation regarding this Easement. After obtaining a temporary restraining order against the Defendant, the Government made a motion for a preliminary injunction in this Court. The debate concerning this motion focused primarily on whether the Easement was actually valid. Ultimately, this Court found that Virginia law is ambiguous on the question of whether the Easement is valid, and therefore it certified this question to the Supreme Court of Virginia. Pending a resolution on the merits, this Court also granted the Government's request for a preliminary injunction against the Defendant in an order dated September 27, 2004. In its preliminary injunction, this Court determined that the Easement should govern the relationship between the Defendant and the Government. The memorandum

Case 3:04-cv-00046-NKM-BWC Document 56 Filed 10/19/05 Page 2 of 11 Pageid#: 430

opinion concluded:

> Blackman shall be enjoined from engaging in any type of renovation on his home without obtaining prior approval from the NPS, as required by the terms of the Easement. This injunction does not, however, extend to basic maintenance and preservation of the manor house in its present state. The Court notes that the Easement itself entitles Blackman to perform basic repairs and maintenance without the written permission of the Government.

Consistent with this conclusion, the Court entered an accompanying order of injunction, which read as follows:

> Plaintiff [sic] Peter F. Blackman ("Blackman") is hereby ENJOINED from engaging in any type of renovation on the manor house on Eastern View Farm without obtaining prior approval from the NPS, as required by the terms of the "Deed of Easement" dated March 19, 1973 (the "Easement") that encumbers his farm. This injunction does not extend to basic maintenance and preservation of the manor house in its present state.

The injunction further stated that during NPS's future review of the Defendant's proposals, the terms of the easement should control "with regard to any proposed renovation, alteration, additions, or improvements on the manor house at Eastern View Farm."

On February 17, 2005, the Government filed a Motion for an Order Directing the Defendant to Show Cause Why He Should Not be Held in Criminal Contempt for completely removing the siding from the front of the house and extensive portions of siding from other portions of the house. The Court granted that motion and directed the Defendant to show cause as to why he should not be held in criminal contempt. Oral arguments were held on September 16, 2005.

3

As it stands now, the manor house is completely without siding on the front and East elevations of the house and mostly without siding on the West elevation. In his Declaration of February 17, 2005, Ed Clark, a Project Manager employed by the NPS and charged with oversight of historic preservation easements in the Green Springs National Historic Landmark District, states that on January 21, 2005 he noticed that the entire siding on the front of the manor house had been removed and that Tyvek wrap covered the surface (Clark Decl. 1). This prompted Clark to speak with the Defendant's attorney, David Franzen, on January 24, 2005 and ask him to stop removing siding until they could have this Court determine whether removal of the siding fell within the scope of the injunction. Franzen replied that these actions were necessary to prevent water infiltration and that his client would continue removing the siding (Clark Decl. 1-2). On January 28, 2005, Clark met with Franzen at the manor house, where the latter informed him that since they had last spoken the siding from the East and West elevations had been removed (Clark Decl. 2). In addition, Clark states that "new insulation was installed, a portion of the corner post was replaced, some studs "sistered", ½" plywood and/or OSB sheathing placed over the old studs, and all work wrapped in Tyvek wrap" (Clark Decl. 2). The removed siding was placed in piles, although none of the old boards that Clark saw were salvageable. Clark further states that even if some of the boards were to be put back up, the added thickness of the new sheathing upon the studs would prevent the siding from laying "in its historic relationship to the window and door trim, corner boards, skirt board, or cornice" (Clark Decl. 2).

## II. Analysis

In the Fourth Circuit, a conviction of criminal contempt for violation of a court order

4

requires proof beyond a reasonable doubt that a party "willfully, contumaciously, intentionally, with a wrongful state of mind, violated a decree which was definite, clear, specific, and left no doubt or uncertainty in the minds of those to whom it was addressed." *Richmond Black Police Officers Ass'n v. City of Richmond, Virginia*, 548 F.2d 123, 129 (4th Cir. 1977) (internal citations omitted). Thus, there is a three-pronged analysis: (1) an intentional, willful, and contumacious (2) violation of an (3) order that was definite, clear, and specific.

In determining whether the order was "definite, clear, specific, and left no doubt or uncertainty in the minds of those to whom it was addressed," the court should pay special attention to the context of the order and the purposes for which it was made. *United States v. McMahon*, 104 F.3d 638, 643 (4th Cir. 1997) (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974)). While the order must be clear and specific, this does not absolve the parties of the responsibility of interpreting the order reasonably in light of its background. "The mere fact that such an interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him." *Greyhound*, 508 F.2d at 537.

In determining whether a party violated an order willfully, the court must look for "a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful." *United States v. Bostic*, 1995 U.S. App. LEXIS 15515 (4th Cir. 1995) (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 531-32 (7th Cir. 1974)). This leaves room for situations where a party violated a court order, but did not do so willfully for criminal contempt purposes. For example, a court will not find willfulness for the purposes of criminal contempt "where there is a good faith pursuit of a plausible though mistaken alternative." *United States v. McMahon*, 104 F.3d 638, 645 (4th Cir. 1997) (quoting *In re Brown*, 454 F.2d 999, 1007 (D.C.

5

Cir. 1971)). The plausibility of the defendant's good faith defense is the touchstone, as he "may not avoid criminal contempt by 'twisted interpretations' or 'tortured constructions' of the provisions of the order." *Greyhound*, 508 F.2d at 532. "While a defendant is, of course, not required to seek [clarification of an order], a failure to do so when combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree." *Id.* In making a finding of willfulness, "the court should [also] consider the entire background behind the order -- including the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings." *Id.*

*A. Was the injunction definite, clear, and specific and did the Defendant violate its terms?*

The Defendant asserts that the Court's injunction is not definite, clear, and specific enough to sustain a finding of criminal contempt because there is no clear distinction between "renovation" and "maintenance" and "preservation." In the alternative, he argues that his actions constitute "renovation" and do not fall within the prohibitions of the injunction. In essence, therefore, his position is that the injunction did not definitely, clearly, and specifically enjoin the type of work he did to the manor house and that at worst his actions fell into a sort of gray area between the permitted and the prohibited.

If the Court were to decide this issue in a vacuum, it might find some merit to the Defendant's position. He is able, for example, to put some "maintenance" or "preservation" gloss on his activities by arguing that the removal of the siding was necessary to install the Tyvek moisture barrier, which he contends was needed to stop toxic mold growth and prevent the continued decay of structural components of the house. Still, this would not comport with the

6

language of the injunction, which permits only "basic" maintenance and preservation of the manor house "in its present state." Even if the Court were to accept the Defendant's characterization of his activities as "maintenance" and "preservation," the sheer scale on which he acted, removing all of the siding on three sides, would move his actions well beyond "basic maintenance" and "preservation of the manor house in its present state" and into the realm of large scale renovation of the house's exterior.

That the injunction clearly prohibits the defendant's actions becomes even more evident when the Court considers his actions in the context of this litigation. As the Government pointed out in the September 16, 2005 contempt hearing, keeping the siding intact was the only issue left for the Government since the Defendant had already made so many changes to the house. The shutters, windows, and front door had already been replaced and the front porch had already been removed. (Clark Test. 10, Aug. 16, 2004) The Government's closing arguments at the August 16, 2004 preliminary injunction hearing clearly convey this concern with maintaining the status quo. There, the Government argued:

"[T]he Park Service was never put on notice that the siding was in an immediate emergency type of situation.

To say it is now, I think there are things that could be done to address that problem to keep the house from sustaining much further damage. It is damaged, there are some rotten boards, we acknowledge that. . . .

I think Mr. Clark testified, if you want to replace a board, that's fine. But when you start

7

engaging in the more extensive repairs, *replacing a whole side of a house*, that's what triggers the Park Service's interest. . . .

(Hr'g Tr. 100-101, Aug. 16, 2004) (emphasis added).

Also, events prior to the preliminary injunction hearing underscore the emphasis on maintaining the siding intact. For example, on June 17, 2004, the Defendant "requested to remove all of the existing siding on the North, East, and West elevations and install composite material siding," but was refused permission by the NPS (Clark Decl. 2). Also, at a subsequent meeting at the house between Mr. Franzen and Ed Clark on July 16, 2004, they both agreed that a few lower layers of siding and some of the corner posts needed to be replaced (Clark Decl. 2). However, Clark informed Franzen that the Defendant's plan to replace all of the siding would have to be reviewed (Clark Decl. 2). Similarly, this concern for preserving the siding is reflected in the June 16, 2004 TRO issued by Judge Turk, which enjoined any renovation work, including "structural changes, alterations, additions or improvements, including the replacement of exterior siding." Since the siding was the only significant historic element of the house's facade that remained intact and was at the center of this litigation, the clear thrust of the Court's order was to limit any work on the siding, subject to basic maintenance and preservation of the house in its present state. The argument that the injunction is ambiguous or that it prohibits *replacement* of the siding while permitting its *removal*, as the Defendant argued at the contempt hearing, finds no basis in either the letter of the injunction or the history of this litigation. Thus, the Court concludes that the injunction clearly, definitely, and specifically prohibited the Defendant's actions and that the Defendant violated the injunction.

*B. Did the Defendant violate the order willfully, contumaciously, and intentionally?*

8

Because the Court has concluded that the injunction was clear, definite, and specific and that the Defendant violated its terms, it must next determine whether the Defendant did so willfully, contumaciously, and intentionally. *Richmond Black Police Officers Ass'n*, 548 F.2d at 129. While the Defendant adamantly denies having violated the injunction, his position also amounts to an attempted defense of good faith - that even if he violated the order, he did not do so contumaciously. As alluded to above, this centers around his alleged belief that the injunction prohibited replacement of the siding while permitting its mere removal. At the contempt hearing, defense counsel pointed out that the June 16, 2004 TRO allowed the Defendant to do virtually no work without the NPS's permission. He went on to state that when the September 27, 2004 injunction created an opening for basic maintenance and preservation, the Defendant understood this to mean that he could remove siding and put up a moisture barrier, but not put up replacement siding.

While pursuit of plausible though mistaken course of conduct would negate the element of willfulness, *see McMahon*, 104 F.3d at 645, the Court does not find that the Defendant's explanation for his actions is plausible. As evidence of his good faith in pursuing his course of conduct, the Defendant points out that he did not put up new siding, that he preserved the old siding under tarps, and that he acted with the advice of his attorney. Yet the evidence and contempt hearing testimony also shows that he intentionally disregarded the dictates of the injunction. For example, during the January 24, 2005 conversation with Franzen, Clark asked that the work be temporarily halted in order to get an opinion from this Court on the matter. Franzen replied that the work would go on because the Defendant believed the injunction permitted the removal. The Defendant, therefore, went on with the removal work without

Case 3:04-cv-00046-NKM-BWC   Document 56   Filed 10/19/05   Page 9 of 11   Pageid#: 437

bothering to consult with this Court first, despite being put on notice of his possible violation of the injunction. The Court also notes that the Defendant's alleged belief that he could remove all or nearly all of the siding on three sides, so long as he did not put up new siding, is patently unreasonable in light of the history and wording of the injunction. So unreasonable is it that the Court finds it tortured and his alleged belief in it unworthy of credence, especially given the fact that the Defendant himself is a sophisticated attorney.[1] The Court, therefore, finds that the Defendant's refusal to seek clarification from the Court and the implausibility of his good faith defense establish the willfulness and contumaciousness of his violation beyond a reasonable doubt. *See Greyhound*, 508 F.2d at 532 ("[A] failure to [seek clarification] when combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree.").

## III. Conclusion

In conclusion, the Court finds beyond a reasonable doubt that the injunction of September 27, 2004 clearly, definitely, and specifically enjoined the Defendant's actions and that he willfully, intentionally, and contumaciously violated its terms. Accordingly, the Court finds the Defendant to be in criminal contempt of court. An appropriate order shall issue.

---

[1] To be sure, this is not to conflate the definiteness element with the intentional violation element of criminal contempt, because

> "the court should consider the entire background behind the order -- including the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings - in determining whether the order is sufficiently specific *and in determining whether the defendant knew or should have known that his conduct was wrongful.*

*Greyhound*, 508 F.2d at 532 (emphasis added).

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: _____
United States District Judge

10-19-2005
Date

11